## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

YOLANDA B.,

        Plaintiff,

      v.

KILOLO KIJAKAZI,
  ACTING COMMISSIONER OF
  SOCIAL SECURITY,[1]

        Defendant.

No. 20 CV 3728

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Plaintiff Yolanda B. brings this action for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, plaintiff's request to reverse and remand the SSA's decision [18][2] is granted, the Acting Commissioner of Social Security's request to affirm the SSA's decision [25] is denied, and this case is remanded to the agency for further administrative proceedings.

### Procedural Background

On April 4, 2017, plaintiff filed an application for supplemental security income, alleging a disability onset date of July 15, 1992. [17-1] 14. The claim was denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held before an administrative law judge (ALJ) on December 6, 2018. [*Id.*] 45-84. In a decision dated May 24, 2019, the ALJ found that plaintiff was not disabled and denied her application. [*Id.*] 14-35. The Appeals Council denied review on April 22, 2020 [*id.*] 1-7, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff timely appealed to this Court [1], and the Court has subject-

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [17], which refer to the page numbers in the bottom right corner of each page.

matter jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g).[3]

## Factual Background

Plaintiff, who was forty-six years old at the time of her application [17-1] 201, sought disability benefits based on her history of schizophrenia, bipolar disorder, personality disorder, and seizure disorder. [*Id.*] 17. Plaintiff has a documented history of suicide attempts [*id.*] 68; [17-2] 959-60, 1100; self-mutilation (cutting her arms and wrists) [17-2] 959, 1083; and repeated psychiatric hospitalizations [*id.*] 741. Plaintiff has never worked. [*Id.*] 959, 1083.

### A.    Treatment Notes from Logan Correctional Center – 2016-2017

Plaintiff was incarcerated at Logan Correctional Center from approximately 2015 through late March 2017 for a theft offense. [17-2] 801. In 2016, plaintiff was prescribed and reported being compliant with multiple medications for her mental-health issues. [*Id.*] 814. However, in June 2016, plaintiff asked to stop taking the medications, and they were discontinued. [*Id.*] 817. According to a February 17, 2017 treatment note, plaintiff "wanted to be on medication to help with anger management and nightmares." [17-1] 792.

An IDOC treatment note from March 4, 2017 documented plaintiff's "long history of depression, anxiety, bipolar, anger and substance use problems." [17-2] 781. Before her incarceration, plaintiff took medication to treat these conditions, but she "has been off medication" while in custody and had experienced "increased depression, anger and mood[iness] since she stopped taking" her medications. [*Id.*]. Plaintiff reported feeling "more depressed" and "need[ed]" to continue her medications, but denied auditory or visual hallucinations. [*Id.*]. According to the treatment note, plaintiff was alert and cooperative during the interview, her attention was appropriately focused, and her thought processes were clear and coherent. [*Id.*] 782.

Plaintiff planned to connect with the Bobby Wright Mental Health Center (Bobby Wright) in Chicago, where she had previously been treated, after she had been paroled. [17-2] 801.

### B.    Post-Release Psychological and Psychiatric Evaluations – May 2017 and November 2017

On May 4, 2017, plaintiff was seen by psychologist Christine Kieffer for a consultative evaluation. [17-2] 958-60. Dr. Kieffer found plaintiff oriented to person,

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [6].

but not to place or time. Kieffer found that plaintiff "didn't understand the purpose of the interview," and plaintiff "kept asking [Kieffer] for medication." [*Id.*] 959. Plaintiff reported auditory hallucinations, including voices that told her to hurt people and "to play with fire," and manic-depressive symptoms. [*Id.*] 959-60. Regarding plaintiff's "history of multiple psychiatric hospitalizations" for "suicidal ideation," "auditory hallucinations," and "self-cutt[ing]," Dr. Kieffer observed that, when plaintiff was hospitalized at Mount Sinai, she had been prescribed Seroquel, Remeron, and Thorazine. [*Id.*]. However, plaintiff told Kieffer that she was not currently using psychotropic medications "because she ran out of medication and stated she had no money for more, hence her request" that Dr. Kieffer provide her with medication. [*Id.*].

Plaintiff attended a consultative psychiatric examination with Dr. Ana Gil on November 9, 2017. [17-2] 1082-87. Plaintiff appeared alert, oriented, engaging, and polite during the exam, but also exhibited mild psychomotor agitation. [*Id.*] 1084. Plaintiff told Dr. Gil that she was receiving treatment at Bobby Wright and was "currently taking Zoloft 100 mg a day and Seroquel 200 mg twice a day." [*Id.*] 1082. Plaintiff described experiencing auditory hallucinations once or twice per week. [*Id.*] 1083. Plaintiff "does not have any friends" and "does not like to go out and be around other people." [*Id.*] 1084.

## C.      Treatment at Bobby Wright – 2017-2018

Plaintiff was seen for treatment at Bobby Wright on October 6, 2017. [17-2] 753-59. Asked what brought her to Bobby Wright that day, plaintiff said, "I am hearing voices and the medicine my doctor is giving me isn't working as good. It isn't as bad as it used to be, but I need something that is gong [*sic*] to help me." [*Id.*] 754. Plaintiff initially denied using illegal drugs, but later admitted that she had recently used marijuana and that she had used cocaine and heroin in 2009. [*Id.*] 755-56.

Plaintiff underwent a psychiatric evaluation at Bobby Wright on October 18, 2017. [17-2] 748-52. The associated treatment notes prepared by psychiatrist Haideri Shikari are mostly illegible and difficult to read, but indicate that plaintiff did not report delusions and was prescribed Zoloft and Seroquel. [*Id.*] 749, 752.

Plaintiff was scheduled for another appointment at Bobby Wright on November 15, 2017, but she missed that appointment and had not contacted her case manger to complete a current treatment plan or mental health assessment. [17-2] 747. On November 27, 2017, plaintiff met with case manager Tyesha Johnson. [*Id.*] 1088. Plaintiff told Johnson, "I want to see the psychiatrist as soon as possible, my medication isn't working." [*Id.*]. Plaintiff reported that "she is taking her medication"–Zoloft and Seroquel–but "she thinks it's working ineffectively due to her high blood pressure and seizure medications." [*Id.*]. Plaintiff also said that she had been hearing "her deceased baby cry for almost two weeks," and that she had been

3

"very sluggish and getting into arguments with people." [*Id.*]. Johnson suggested that plaintiff try taking her medications at different times and monitor the situation for a change. [*Id.*].

On December 3, 2017, plaintiff was admitted to MacNeal Hospital after a suicide attempt. [17-2] 1100. Plaintiff called Johnson on December 6 and denied having attempted suicide, claiming that "I never wanted to hurt myself I just wanted to take enough medication to make the voices go away." [*Id.*] 1090; *see also* [*id.*] 1108 (treatment note observing that plaintiff "unfortunately denied having overdose[d]"). Medical records from MacNeal reflect that plaintiff complained that her seizures got worse before her suicide attempt, and that "[o]ne of the reasons" for this was that plaintiff "is noncompliant in taking her medication." [*Id.*] 1108. Plaintiff admitted to noncompliance with her medications for bipolar disorder, which led her to "bec[o]me depressed" and hear voices "tell[ing] her to kill herself." [*Id.*]. During her hospitalization, plaintiff was initially disruptive and exhibited poor concentration, but later became pleasant, alert, and attentive and her concentration improved. [17-1] 25; [17-3] 1220. When she was discharged, plaintiff was prescribed Seroquel, Remeron, and Zoloft. [17-3] 1206.

On January 8, 2018, case manger Johnson prepared a written report for plaintiff's attorney in connection with plaintiff's pending application for disability benefits. [17-3] 1262. Johnson stated that plaintiff had been a "consumer" at Bobby Wright since March 11, 2014, where she received "psychiatric, case management, individual counseling, medication monitoring, and community support services." [*Id.*]. Plaintiff's diagnoses included "Schizophrenia, unspecified type" and "Post-traumatic Stress disorder (i.e., agitation, visual and/or auditory hallucinations, disorientation and loss of interest)." [*Id.*]. Johnson noted that plaintiff was "currently taking psychotropic medications to minimize her symptoms," but "the medication has side effects" like drowsiness, insomnia, and dizziness." [*Id.*].

On June 28, 2018, plaintiff was admitted to the emergency room at Jackson Park Hospital after she "tried to kill herself by ingesting several pills and trying strangulation with a purse strap." [17-3] 1266. At the time of this suicide attempt, plaintiff was in police custody because she had been "caught shoplifting." [*Id.*]. Plaintiff was intoxicated, uncooperative, and agitated when she was admitted to the hospital, and toxicology screening was positive for marijuana, cocaine, and opiates. [*Id.*] 1271. Treatment notes reflect that plaintiff reported "taking psych meds inconsistently," and that she had last taken her medication on the day of the suicide attempt. [*Id.*]. Staff at Jackson Park were unable to get more history from plaintiff due to her "uncooperativeness." [*Id.*]. On discharge, plaintiff "report[ed] current auditory hallucinations" but she was "not overtly psychotic, suicidal, homicidal or gravely disabled." [*Id.*] 1279.

Plaintiff returned to Bobby Wright on August 29, 2018 to discuss her noncompliance with treatment with a different case manager, Taiwo Jenkins. [17-3] 1414-17. Jenkins advised plaintiff that she needed to keep with her appointments and be compliant at all times, rather than "just show[ing] up when she runs out of medication or needs court paperwork." [*Id.*] 1414. Plaintiff received another prescription for Zoloft and Seroquel. [*Id.*] 1417, 1419. Plaintiff also sought a letter from Dr. Shikari to support her benefits application, but Shikari stated that "he will not append his signature to any letter for consumer that [had] not been six months compliance with both medication and treatment." [*Id.*] 1417.

On September 25, 2018, plaintiff spoke with Jenkins while she was hospitalized at St. Bernard Hospital due to severe pain. [17-3] 1420. Plaintiff had felt uneasy that morning and went to the hospital "when [she] could no longer tolerate the pain." [*Id.*]. After plaintiff was released from the hospital, Jenkins met with her at her house and assessed her "based on the seven dimensions of Locus – functional status, medical, addictive and psychiatric, morbidity, recovery environment and treatment and recovery history" and found plaintiff to be in "very bad shape." [*Id.*] 1422. Plaintiff said, "I know I have not been doing good but I am ready to make changes to my life because I don't want to die." [*Id.*]. Jenkins encouraged plaintiff to strictly follow her recovery plan. [*Id.*].

At an October 10, 2018 meeting with Dr. Shikari to discuss refilling plaintiff's medication, Jenkins explained that plaintiff had missed her recent appointment at Bobby Wright due to a hospitalization. Jenkins urged Shikari to write the prescription to "avoid any psychotic episode" and explained that Jenkins would "deliver it to [plaintiff] at her place of residen[ce]." [17-2] 1423. Dr. Shikari "read through [plaintiff's] chart to verify she had been compliance with treatment before agreeing to writing the prescription" for Seroquel and Zoloft. [*Id.*]. That same day, Jenkins met with plaintiff at her home and "dealt with the psychosis symptoms" that plaintiff complained about, including "hallucinations, impulsiveness, delusion, anxiety, anger, suicidal thought and poor concentration on things." [*Id.*]. Plaintiff told Jenkins that "I just feel like dying because it seems like nothing is working for me. I am not good with people and can't have people around me, I might hurt them." [*Id.*]. Jenkins again counseled plaintiff that "things would be better if she follow[ed] her treatment plan and compl[ied] with the prescribed medications." [*Id.*].

On January 22, 2019, Jenkins completed a "Report by Case Manager or Therapist" for plaintiff's attorney. [17-3] 1666-67. Jenkins explained that she began treating plaintiff on August 29, 2018, that she had most recently seen plaintiff on January 14, 2019, and that plaintiff had been with Bobby Wright since October 2017. [*Id.*] 1666. Jenkins's involvement in plaintiff's case included individual therapy and counseling, providing medication training and monitoring, crisis intervention, psychiatric evaluations, and psychological evaluations. [*Id.*]. After noting plaintiff's diagnosis of mild bipolar disorder, Jenkins opined that plaintiff's symptoms were

5

triggered by encounters with other people and groups of people. [*Id.*]. Asked whether plaintiff experienced side effects from her prescribed medications, Jenkins stated "most likely, based on her ER notes." [*Id.*] 1667.

Also on January 22, 2019, Dr. Shikari completed a mental residual functional capacity (RFC) statement. [17-3] 1669-72. Shikari noted that plaintiff was presently taking Zoloft and Seroquel, but complained that her medications made her tired, dizzy, and drowsy all the time; plaintiff also had to be reminded and called back to activities most times. [*Id.*] 1669. Dr. Shikari opined that plaintiff's mental impairments would preclude her from performing multiple work-related tasks for at least 15 percent of an eight-hour work day, including (1) understanding and remembering very short and simple instructions, (2) performing activities within a schedule and maintaining attendance, (3) sustaining an ordinary routine without special supervision, (4) asking simple questions or requesting assistance, (5) accepting instructions and responding appropriately to criticism from supervisors, (6) maintain socially appropriate behavior, and (7) responding appropriately to changes in the work setting. [*Id.*] 1671. In response to a different question asking how long plaintiff would be off-task based on the totality of her impairments, Dr. Shikari opined that plaintiff would be off task "10% or less" of a workday. Shikari further opined that, because of plaintiff's mental and physical impairments, plaintiff would be expected to be absent from work more than six days per month; plaintiff could also be expected to perform a job at about 20% efficiency as that of an average worker. [*Id.*]. Dr. Shikari added that, "based on observation, medication, and the psychiatrist evaluation, it might be dangerous to allow [plaintiff] to work or be around people because she is suicidal." [*Id.*] 1672. Dr. Shikari based these opinions and others in the mental RFC statement on psychological evaluations, psychiatric evaluations, medications, and plaintiff's "own words." [*Id.*].

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A

negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. Jun. 29, 2021) (internal quotation marks and citation omitted).

## Discussion

At step one of his decision, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 4, 2017, the date of her application. [17-1] 16. At step two, the ALJ found that plaintiff had multiple severe impairments: schizophrenia, post-traumatic stress disorder, bipolar disorder, mixed personality and impulse control disorder, seizure disorder, obesity, and osteoarthritis of the knees. [*Id.*] 17-18. At step three, the ALJ ruled that plaintiff does not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments. [*Id.*] 18-20. Before turning to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that plaintiff could perform only simple, routine tasks; could only occasionally work with others and could never work on joint tasks with others; and could not tolerate interactions with members of the public. [*Id.*] 20-33. At step four, the ALJ found that plaintiff had no past relevant work. [*Id.*] 33. At step five, the ALJ determined that there were three jobs that existed in significant numbers in the national economy that plaintiff could perform: circuit board assembler, table worker, and addresser. [*Id.*].

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) erred in evaluating her subjective symptom allegations, (2) did not properly evaluate the opinions of a psychiatrist and her case managers at Bobby Wright, and (3) should have included more restrictive limitations in the RFC determination. [18] 9-15. Regarding the ALJ's subjective-symptom analysis, plaintiff emphasizes that the ALJ discredited her allegations based on his finding that plaintiff did not comply with her medication and treatment regimen, but never considered why plaintiff was noncompliant with medications and treatment. [*Id.*] 11.

The Court agrees that the ALJ committed reversible error by drawing an adverse inference based on plaintiff's noncompliance with medication and treatment

without considering the reasons plaintiff was noncompliant or whether plaintiff's mental illnesses–in particular her bipolar disorder–caused or contributed to the noncompliance.[4]

"When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." *Devon R. v. Kijakazi*, Case No. 21 C 1562, 2022 WL 3716264, at *2 (N.D. Ill. Aug. 29, 2022). "An ALJ's findings concerning the intensity, persistence, and limiting effect of a claimant's symptoms must be explained sufficiently and supported by substantial evidence." *Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021). An ALJ's evaluation of a claimant's subjective symptom allegations may be overturned only if it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

If a claimant "fails to follow prescribed treatment that might improve symptoms, [the ALJ] may find that the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). In other words, "[a] claimant's statements about symptoms may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.'" *Charles B. v. Saul*, Case No. 19 C 1980, 2020 WL 6134986, at *7 (N.D. Ill. Oct. 19, 2020) (internal quotation marks omitted). "However, the ALJ must not draw any inferences about a claimant's condition" from her failure to comply with prescribed medications or treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (internal quotation marks omitted).

Furthermore, in cases involving claimants with mental illnesses, "[t]he Seventh Circuit has repeatedly held that ALJs must consider the effect mental health illnesses may have on a claimant's ability to comply with treatment." *Pulley v. Berryhill*, 295 F. Supp. 3d 899, 901 (N.D. Ill. 2018). "[O]ne of the most serious problems in the treatment of mental illness" is "the difficulty of keeping patients on their medications. The drugs used to treat schizophrenia, for example, can make a patient feel drowsy and stunned." *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010). The Seventh Circuit has accordingly held that "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference." *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

---

[4] Because this issue is dispositive, the Court does not reach plaintiff's other arguments for reversal.

In this case, the ALJ determined that plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms" were "inconsistent" with the medical record because that record purportedly "reflects that seizures and exacerbations of mental symptomology occur in the context of noncompliance with medication or treatment. The claimant has treatment available to her at Bobby Wright and at Lawndale/Mt. Sinai but does not avail herself of it." [17-1] 22. The ALJ repeatedly relied on plaintiff's noncompliance with medication throughout his decision, including when he determined plaintiff's limitations interacting with others[5]; her limitations in concentrating, persisting, and maintaining pace[6]; her limitations in adapting or managing herself[7]; and the credibility of her allegations that her mental impairments prevented her from working.[8] He repeatedly highlighted instances of medication noncompliance in the medical record, *see* [17-1] 22-28, and he considered plaintiff's non-compliance as one of several factors in weighing–and discrediting–the opinions of one of plaintiff's case managers at Bobby Wright.[9] And the ALJ concluded that plaintiff's "repeated and ongoing non-compliance with medication or treatment" was among the "[m]ost important" inconsistencies with the record that "mitigate[d] against a finding of greater limitation than set forth in my residual functional capacity findings." [*Id.*] 32.

Despite his extensive reliance on plaintiff's noncompliance with medication and other treatments, the ALJ never considered "possible alternative explanations" before he concluded that "non-compliance with medication supports an adverse credibility inference," *Jelinek*, 662 F.3d at 814, and "mitigated against a finding of

[5] [17-1] 19 ("Given the claimant's ability to interact appropriately with others but acknowledging that when non-complaint with medications she is less tolerant of others, I have precluded interaction with the general public and limited work with others to 'occasional.'"); [*id.*] 22 ("Instead, when compliant with medication, not attempting to avoid legal difficulties, and not using marijuana or cocaine, the claimant is calm, friendly, polite, cooperative, and appropriate.").

[6] [17-1] 19 ("Aside from episodes of lesser ability when the claimant is abusing drugs and non-compliant with medication, the record does not reflect significant deficit in concentration, persistence, or maintaining pace.")

[7] [17-1] 20 ("As detailed in all of the records below, when the claimant is compliant with medication, she has no behavior issues and is not aggressive or inappropriate.").

[8] [17-1] 32 ("Regarding *treatment other than medication*, here, the claimant was repeatedly advised to comply with referrals to specialists but there is no indication she did so. Again, inconsistent with allegations, the claimant is repeatedly non-compliant with medication and treatment. With medication compliance, her symptoms abate. Regarding *type, dosage, effectiveness, and side effects of medication*, when [*sic*] has ameliorated her symptoms and have not caused notable side effects according to her doctor's treatment notes other than self-reported hair loss from one medication. However, as noted throughout the record, the claimant more often chooses not to take medication including another seizure medication for which she did not report side effects.") (emphases in original).

[9] [17-1] 26 (observing that plaintiff told Johnson "she was medication compliant, which as seen throughout the record, was an inaccurate indication at best").

9

greater limitation than set forth" in the RFC determination [17-1] 32. Nor did the ALJ "consider[ ] the fairly obvious possibility that Plaintiff's mental impairments made it difficult for [her] to remember to take [her] medications and seek re-fills[.]" *Reid C. v. Saul*, No. 19 CV 50101, 2020 WL 6747001, at *5 (N.D. Ill. Nov. 17, 2020). The ALJ's failure to explore these issues and address them in his written decision were critical errors that completely undermine the denial of benefits in this case because "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *see also Melissa A. v. Comm'r of Soc. Sec.*, Case No. 3:22-CV-36-NJR, 2023 WL 2648487, at *8 (S.D. Ill. Mar. 27, 2023) (remanding where ALJ drew adverse inference based on failure to comply with medication but "failed to sufficiently engage with evidence" that "Plaintiff's mental health impacts her ability to take advantage of treatment and her medication"); *Nygra v. Saul*, Cause No. 2:20-cv-146-RLM-SLC, 2021 WL 1178720, at *6 (N.D. Ind. Mar. 5, 2021) (remanding where there was "no indication that the ALJ considered Nygra's mental illness may have prevented him from seeking treatment or consistently taking his psychotropic medications"); *Pulley*, 295 F. Supp. 3d at 901 (remanding based on ALJ's failure to consider "possibility that plaintiff's mental illnesses made it difficult to comply with treatment recommendations"), *report and recommendation adopted*, 2021 WL 1178159 (N.D. Ind. Mar. 29, 2021).

Plaintiff's testimony at the administrative hearing underscored the ALJ's need to inquire into this issue. The ALJ asked plaintiff why there were times when she was "not taking your seizure medications when you were supposed to," and plaintiff responded, "Because I forget." [17-1] 82. Plaintiff also testified that she did not go to Bobby Wright on a regular basis because it was "hard for me to get there." [*Id.*]. In addition, the treatment record documents multiple instances of plaintiff or her providers identifying possible explanations for her noncompliance with medications. *See, e.g.*, [17-2] 747 (medications made plaintiff argumentative and sluggish); [*id.*] 754 (medications were not as effective as they had been); [17-3] (side effects of prescribed medications included dizziness, drowsiness, and insomnia). Nevertheless, the ALJ did not explore this testimony further at the hearing, nor did he address this evidence at all in his written decision. Accordingly, "the Court cannot be sure how"– or even if–"the ALJ reasoned through this issue." *Pulley*, 295 F. Supp. 3d at 902 (remanding where ALJ asked claimant with bipolar disorder and schizophrenia why he had been off medication and stopped attending treatment but did not address testimony in written decision).

The Acting Commissioner contends that, "even if the ALJ's reasoning on certain points was not airtight, this does not mean his overall assessment of plaintiff's symptom complaints was patently wrong." [25] 15 (internal quotation marks and ellipsis omitted). The Acting Commissioner also argues that remand is not required "where, as here, medication non-compliance was not the ALJ's sole rationale for discounting the claimant's subjective allegations." [*Id.*]. These arguments have no

merit. The ALJ's finding that plaintiff's "seizures and exacerbations of mental symptomology occur in the context of noncompliance with medication or treatment" was *the* core finding on which the ALJ's decision rests. As discussed above, it affected not only the ALJ's subjective-symptom analysis, but also his findings regarding the extent of plaintiff's non-exertional limitations, his evaluation of a medical source's opinion, and–as the ALJ himself acknowledged–his decision not to craft a more restrictive RFC. *See* [17-1] 32 (ALJ stating that inconsistency between plaintiff's allegations and the medical record concerning "repeated and ongoing non-compliance with medication or treatment was" one of the "[m]ost important" factors that "mitigate[d] against a finding of greater limitation" in ALJ's "residual functional capacity findings"). While the Court recognizes the principle that, "in discounting a claimant's subjective allegations, not all of the ALJ's reasons must be valid as long as *enough* of them are," *Frank R. v. Kijakazi*, No. 19 CV 3223, 2021 WL 4264386, at \*16 (N.D. Ill. Sept. 20, 2021) (internal quotation marks and brackets omitted), that principle does not apply here, given how substantial the ALJ's error was and its effects on multiple components of his decision.

In sum, the ALJ erred by drawing an adverse inference based on plaintiff's noncompliance with medication and treatment without considering possible reasons for the noncompliance and whether plaintiff's bipolar disorder and other mental impairments contributed to that noncompliance. Because the ALJ's error was so substantial and so critical to his rejection of plaintiff's application for benefits, on remand the ALJ must consider plaintiff's application anew and "should consider all [issues raised by plaintiff] with a fresh eye and should provide a thorough analysis of these and other relevant issues." *Pulley*, 295 F. Supp. 3d at 907.

## Conclusion

For the reasons set forth above, plaintiff's request to remand the SSA's decision [18] is granted and the Acting Commissioner of Social Security's request to affirm the SSA's decision [25] is denied. In accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: June 12, 2023**